### JOHN NOLAN *v.* JOHN R. SHAW & CO.

The relation between factor and principal is not the ordinary relation between debtor and creditor. It is a relation of trust and confidence. The factor is to be considered as undertaking to hold the funds confided to him by his principal subject to his own order, and to be ready to pay them over to him, deducting only his own charges and advances made in the course of his employment, and cannot retain the funds upon the ground of having paid other claims against the principal, which he had received notice from the principal not to pay.

APPEAL from the Fifth District Court of New Orleans. *Buchanan, J.*
*R. H. Marr*, for plaintiff, contended : *John R. Shaw & Co.*, a commercial firm in New Orleans, professing to act as agents for *John Nolan*, a planter residing in the parish of West Baton Rouge, and also for *James Goodloe*, an engine builder living at Cincinnati, entered into a writing dated 26th November, 1845, purporting to be an agreement for the building and putting up of a sugar mill and engine for *Nolan*, to be completed on or before the 1st day of September, 1846, for the sum and price of $6250, to be paid in the month of March, 1847. This writing is signed "*James Goodloe*, by his agents *John R. Shaw & Co.*;" "*John Nolan*, by his agents *John R. Shaw & Co.*" *Goodloe* put up a mill and engine. The evidence does not show at what time they were completed ; but *Nolan* was not satisfied with the machinery, or with the manner in which the work had been done. Having a large amount of money in the hands of *Shaw & Co.*, who were his factors and commission merchants, *Nolan* wrote to them on the 29th December, 1846, requesting them to pay *Goodloe* nothing, for any purpose whatever, on his account ; and he goes on to give the reasons for this course, saying, among other things, that he feared he should never be remunerated for the great losses he had sustained by the failure of *Goodloe's* work, and that he could not think of paying him anything under the circumstances. To this letter *Shaw & Co.* replied a few days after, on the 2d January, 1847, saying they would settle nothing without *Nolan's* orders, and informing him, that it has always been their custom to pay out money for no one without orders.

On the 23d of March, 1847, *Goodloe* was indebted to *Shaw & Co.* for advances, in an amount exceeding the price of the sugar mill and engine ; and *Shaw & Co.*, having money belonging to *Nolan* in their hands, credited *Goodloe's* account with $7267 43, and charged *Nolan* with that amount in two items— cost of sugar-mill and engine, $6250 ; and amount paid for extra work, $1017 43 —retaining the money themselves and appropriating it to their own use.

On the 21st of June, 1847, *Shaw & Co.* rendered to *Nolan* their account current, in which he is charged with the $7267 43, as so much paid for the mill and engine, and extra work. There is nothing to show that *Nolan* was ever informed of this pretended payment until the rendition of the account current, and he immediately disapproved of it, and refused to sign a receipt in full, as it was written by *Shaw & Co*, for the balance shown by that account. He also transferred his business to another house, and has not employed *Shaw & Co.* since that time.

In June, 1848, *Nolan* brought suit against *Shaw & Co.*, to recover the amount alleged to have been paid to *Goodloe*. There seems to have been an *ex parte* trial of the cause. The defendants introduced their testimony and submitted the case. No evidence was offered on the part of the plaintiff, and the suit was discontinued.

In November, 1849, the present suit was brought to recover the amount alleged to have been paid to *Goodloe*, and two other items of the account cur-

rent, amounting to $250 43, with which, the petition alleges, *Nolan* is not properly chargeable. The answer is a general denial; and it also sets up the fact, that *Shaw & Co.* were the general agents of *Nolan*, and in all things have faithfully discharged their duty. The judgment of the court below was in favor of the plaintiff for $7267 47, with interest from the 23d of March, 1847. *Shaw & Co.* appealed, and *Nolan*, in answer to the appeal, prays that the judgment may be so amended as to allow him the additional sum of $253 47, with interest from the 19th of June, 1847, as claimed in his petition.

On the trial of the cause, the defendants offered in evidence the pleadings and evidence in the former suit, and the writing purporting to be a contract between *Nolan* and *Goodloe;* to the introduction of which the plaintiff's counsel objected, and took bills of exception to the opinion of the court admitting them.

The objection to the admission of the record and evidence in the first suit is, that the issues were different, and the testimony was not relevant to the issue made in the present suit. In the former suit an issue is made upon the indebtedness of *Nolan* to *Goodloe*. No such issue is made in the present suit; and *Nolan* bases his right to recover upon the fact, that the payments with which he is charged, if made at all, were made without his authority or consent. It was immaterial in the first suit, and it is equally so in this, to inquire whether *Nolan* was or was not indebted to *Goodloe ;* as the fact of indebtedness alone, if established, would not authorize *Shaw & Co.* to pay the debt without *Nolan's* consent. It is true they plead, that they were *Nolan's* agents to make the contract; but a power to contract for another is very different from a power to acknowledge and pay a debt growing out of that contract, which latter power must be express and special. C. C. 2966. The question of that indebtedness did not arise in this suit; and evidence tending to prove it is totally irrelevant to the present issue between the parties. 1 Greenleaf's Evidence, p. 61, sec. 51. Moreover, the writing purporting to be a contract is, on its face, a nullity. It is signed by *John R. Shaw & Co.*, as agents for both parties. It lacks the essential requisite of a plurality of persons ; and it cannot be pretended, that it was obligatory either upon *Nolan* or *Goodloe.* Their interests conflicted, there was no *aggregatio mentium.* C. C. 1754, 1772, 1792. *Florance* v. *Adams*, 2 R. R. 556. *Nolan* may have authorized *Shaw & Co.* to contract with *Goodloe*, but they became incapable of representing him when they attempted to act for the other contracting party. *Beale* v. *McKiernan*, 6 L. R. 418. It is not shown, that *Nolan* was informed of their agency for *Goodloe ;* and it is barely possible that he would have constituted them his agents for the purposes of that contract, if he had known that they were the representatives of *Goodloe.* No implied ratification of this void contract can result from the simple fact, that *Goodloe* built for *Nolan* a mill and engine, unless it is proven, that *Nolan* accepted the work, with a full knowledge of the existence of the writing, and of its terms and specifications, and of all the material facts connected with it. See *Owings* v. *Hull*, 9 Peters, 629. Such an instrument could not be used to prove the character and specifications of the work to be done by *Goodloe*, nor the price to be paid by *Nolan*, nor the time at which the payment was to be made ; and the only purpose for which it could be legitimately used is, to prove *rem ipsam* that such a writing existed—a fact not put at issue by the pleadings.

The two items which were rejected by the court below are, amount of judgment paid *Weld & Co.*, $153 47, and fee paid *C. M. Randall*, $100. In answer to the fifth interrogatory propounded by the plaintiff, *Shaw & Co.* admit that the suit of *Weld & Co.* was against them, and the judgment against them, and not against *Nolan :* and in answer to the sixth interrogatory they admit that it was in this case as their attorney, and in their defence that the services were rendered for which they paid *Randall* the $100. The case came up to this court, and by reference to it, (2d Ann. 559,) it will be seen, that the object of the suit was, to render *Shaw & Co.* personally liable ; and such was the judgment of the court. The business of the attorney of *Shaw & Co.* was to shield them from liability ; and he attempted to do this by showing that they were acting merely as agents for *Nolan*. Had he succeeded in doing this, the result would have been to establish *Nolan's* liability, and to subject him to the suit of *Weld & Co.* Surely, they ought not to be permitted to charge *Nolan* with the amount of this judgment, and with the fee of their attorney. The opinion of this court in the case of *Barker* v. *York*, 3d Ann. 94, is conclusive against such a claim on the part of the attorney ; and if *Shaw & Co.*, as agents for *Nolan*, so

NOLAN
v.
SHAW.

conducted themselves as to become personally responsible to *Weld & Co.* for a breach of contract, it does not seem just or legal that the consequences of their conduct should be visited upon *Nolan.* C. C. 2993.

It may be that *Nolan* is really indebted to *Goodloe*; but what have *Shaw & Co.* to do with that indebtedness? They could not make *Nolan* their debtor by paying, without his consent, a debt acknowledged by him; much less, one which he did not acknowledge and protested against paying. unless they were legally or by convention subrogated to the rights of the creditor to whom they might make such payment. C. C. 2155, 2156, 2157. *Harrison* v. *Bisland*, 5 R. R. 204. *Nolte et al.* v. *Their Creditors*, 7 N. S. 603. They do not pretend, that there was any conventional subrogation, nor was their position such as to create a subrogation in their favor, as a matter of right and of law, without a positive contract. C. C. 2157. But the answer to the third interrogatory shows, that there has been no payment made to *Goodloe*, and that *Shaw & Co.* merely retain, for a debt which they allege to be due to them by *Goodloe*, the amount with which they have charged *Nolan* in their account of 21st June, 1847.

Suppose *Shaw & Co.* had plead, in compensation of *Nolan's* demand, the amount which they pretend to have paid *Goodloe*, and the judgment in favor of *Weld & Co.*, and the fee paid *Mr. Randall*, could they have succeeded on that plea? By their account current of 21st June, 1847, the gross amount due by them to *Nolan*, is fixed and liquidated; and the only part of that account which is not liquidated is the amount of credits to which they are entitled. Even if they had been subrogated to the rights of *Goodloe*, of *Weld & Co.*, and of *Randall*, they could not oppose these claims, which were not liquidated by any act or agreement of *Nolan's*, part of which he positively refused to pay, to *Nolan's* claim against them, upon an account stated by themselves. C. C. art. 2205. *Maxwell* v. *Collier*, 5 R. R. 87. But they have not plead compensation; and the law requires that it should be pleaded specially. C. P. 367.

It may be, too, that the mill and engine were not completed in time, and that *Nolan* actually sustained the great losses of which he complains in his letter of 29th December, 1846. But these are matters to be inquired of between *Nolan* and *Goodloe*, not between *Nolan* and *Shaw & Co.* If *Goodloe* has any claim against *Nolan*, let him sue for it in *Nolan's* parish, where he has a right to have it litigated, where the work was done, and where the witnesses live; and then, and there perhaps, upon a proper issue, *Nolan* will be able to show that he is entitled to recover heavy damages for the failure of *Goodloe's* work. *Shaw & Co.* were advised by *Nolan's* letter, that there was a difficulty in the settlement to be made with *Goodloe*, and they promised not to interfere in that difficulty. What right had they afterwards to interpose and by their officiousness to preclude *Nolan's* claim for damages; to change the forum from *Nolan's* domicil to their own; and to compel him to occupy the position of plaintiff in an action against themselves, instead of that of defendant and plaintiff in reconvention in a suit with *Goodloe?*

If there are any outstanding balances between *Shaw & Co.* and *Goodloe*, let the parties interested adjust them. So far as *Nolan* is concerned, he claims, as a right which he is not willing to relinquish, and which he confidently asks at the hands of this court, that he may be permitted to settle with his creditors in his own way, not through the self-constituted agency of *John R. Shaw & Co.*, or of any other person who may assume to dispose of his money at pleasure. If any express authority or implied power to settle with *Goodloe* ever existed, it was revoked by *Nolan's* letter of 29th December, 1846, nearly three months before the pretended payment. The truth and real position of the matter is just this: *Shaw & Co.*, as factors and commission merchants, sold *Nolan's* crops and received the proceeds, part of which they retain and refuse to pay over, upon a pretext which has no legal foundation, and which is entitled to no consideration in an equitable point of view. C. C. art. 2927. The money in their hands still belongs to *Nolan*, and has been unjustly withheld for nearly four years; and he only asks, that his own may be awarded to him, with interest, as provided by article 2984 of the Civil Code, to which, his counsel respectfully submits, he is most righteously entitled.

*Hunton* and *Bradford*, for defendants, contended: *John R. Shaw & Co.* of New Orleans, having been for many years the general agents and factors of *John Nolan*, a planter of West Baton Rouge, were, in the year 1845, authorized by *Nolan* to contract with *James Goodloe* for the erection of a sugar mill and engine, of specified dimensions, on the plantation of said *Nolan.* The

specifications were furnished by *Nolan* himself, and *Shaw & Co.* having been authorized by *Goodloe*, committed the contract to writing, acting in that behalf, as the agent of both parties. The contract was faithfully executed and fulfilled by *Goodloe.* He did erect the mill and machinery according to the contract: the same was accepted by *Nolan.* The testimony as to *Goodloe's* compliance with the contract is full and complete. By the terms of the contract, the mill and machinery were to be paid for in the month of March, 1847.

About the 1st January, 1847, the defendants received from *Nolan* a letter informing them, that the machinery was not made according to the contract; instructing *Shaw & Co.*, his agents, not to pay anything to *Goodloe* on account of it. *Shaw & Co.* replied, that they regretted his difficulty with *Goodloe*, and assured him, that they would pay nothing to *Goodloe* on account of said contract. Their letter is dated 2d January, 1847. Notwithstanding the positive instructions of their principal, *Nolan*, to *Shaw & Co.*, they, having satisfied themselves that *Goodloe* had in fact performed his contract with *Nolan* in good faith, and believing that he was justly entitled to demand from them, as agents of *Nolan*, payment for the said mill and machinery, on the 23d of March, 1847, by an arrangement with *Goodloe*, did settle, extinguish and satisfy his demand against *Nolan*, on account of the erection of the said mill and engine, under the contract aforesaid.

This settlement was not made by an actual payment in money, made at the time to *Goodloe*, but in the following manner: The said *Shaw & Co.* being the agents as aforesaid of *Goodloe*, had, on the faith of this contract with *Nolan*, and of other contracts of like nature with other persons, accepted, prior to March, 1847, the drafts of *Goodloe* to an amount exceeding the demand of *Goodloe* against *Nolan* on account of said mill, and on the 23d day of March, 1847, satisfied and discharged *Nolan's* liability to *Goodloe*, by crediting the said *Goodloe* with the amount of $7267 43, and charging the same to *Nolan*.

About the facts in this case there is no dispute. It is proved, that *Shaw & Co.*, in contracting for the machinery, &c., acted as the agents of *Nolan*. It is in proof, that the mill and machinery, as contracted for, was erected by *Goodloe* in a good and workmanlike manner, and that after it was actually in operation *Nolan* expressed himself well satisfied with it. It is proved that, *John R. Shaw & Co.*, as *Nolan's* agent, paid for the mill, &c., as hereinbefore mentioned, in violation of his principal's instructions. And now, it is admitted, that in consequence of this violation, he is responsible to *Nolan* for any damages or loss he may have sustained thereby.

The only question in the case is as to the measure of damages. In all cases of neglect of duty or disobedience of orders or instructions, it is a presumption of law that the agent is responsible in damages. If the principal has incurred any loss in consequence thereof, the agent is bound to repair it; if he has sustained none, it is "*damnum absque injuria*," and the agent cannot be held responsible. There can be no other rule as to damages, and upon this point all the authorities are agreed. See Story on Agency, c. 8, s. 217; c. 9, s. 236. Sedgwick on the Measure of Damages, c. 12, p. 347 and 348. Dunlap's Paley's Agency.

The court is also referred to the case of *Walker et al. v. Smith*, 1 Wash. C. C. Rep., 153. In this case a merchant sent to his agent a package of goods with instructions to deliver it to the purchaser only upon condition of actual payment or of his giving security. The package was delivered by the agent without his receiving payment or taking security. The purchaser proved insolvent and the agent was sued. The court say in rendering judgment that the amount in controversy was small, but that they wish to establish a precedent, and instructed the jury that the measure of damages was (not the value of the package, but) the injury which plaintiff had sustained; and the jury returned a verdict for an amount considerably less than the value of the package; and though in this case, it would seem, that the injury to plaintiff was only to be compensated by giving him the value of the package, yet the court, in instructing the jury, wished to avow the general principle, that the measure of damages is the injury done. As to the question raised by defendant, whether *Shaw* has in fact made a payment, we think there can be no doubt. *Goodloe* was indebted to *Shaw & Co.* in an amount exceeding his claim upon *Nolan*. *Shaw*, in crediting *Goodloe* with $7,267 43, and charging the same to *Nolan*, extinguished *Goodloe's* debt *pro tanto*, and in effect paid that amount to *Goodloe* for *Nolan*. See Pothier, Contrat de Mandat., chap. 3, Nos. 71, 73.

Assuming then, that *Shaw* has paid for the mill, &c., according to the terms of the contract, which he, as agent for *Nolan*, made with *Goodloe*, though in violation of the instructions of his principal, and testing his responsibility by the rules above referred to, what should be the judgment in this case ? Assuredly, we think, for defendants. The proof is clear that the work was done in the manner agreed ; that *Nolan* received it ; was satisfied with it in the fall of 1846 : that the engine worked well; and the consequence follows, that *Nolan*, in justice, ought to have paid for it. What loss, what injury has he incurred by defendants' act? The only loss is that which some men imagine they have sustained whenever they pay out monies, even though in discharge of their just debts.

The depositions of *McQuilkin* and of *Shaw*, prove that *J. R. Shaw & Co.* had for many years acted as the general and special agents of *Nolan*, to contract and pay debts, &c. The account rendered by *Shaw* to *Nolan*, and approved and settled by the latter, with the exception of the items in controversy in this suit, shows that *Shaw* was in the habit of paying debts for *Nolan* without his express order in every particular case ; and this court should, therefore, infer an authority to do so. And when *Shaw*, relying upon that general authority and the previous course of dealing between himself and his principal, had made advances to *Goodloe* upon the faith of his principal's integrity and honesty, we think he should be protected therein.

And what would be the effect of an affirmance of the judgment now sought to be reversed ? *Shaw* has paid *Goodloe* for the engine he, as agent, contracted for. Paying, as agent, he could never recover the amount so paid from *Goodloe*, and if this judgment be affirmed, he must inevitably lose $7267 43. The contract of mandate, under which this contract arises, is one which should be construed, as Merlin says, according to the principles of *jus gentium*, or of natural justice and equity. Good faith on the part of *Shaw* required that he should see that *Goodloe* was paid for the work he had faithfully performed at his instance ; and now that he has paid that which his principal should have done, he ought, in justice and equity, to be kept harmless, and his conduct approved.

The judges being equally divided in opinion, the judgment of the lower court was affirmed.

SLIDELL, J. The petition in this case alleges that the defendants, in the capacity of factors and commission merchants, received for the plaintiff's account, at different times, various sums of money, and so became indebted to him in the gross sum of $14,554 23, as shown by an account current rendered by them. That in said account he is improperly charged with certain payments, made by the defendants without his authority or consent. The suit is brought to recover the amount of funds in the factors' hands, exclusive of these payments.

The defendants answered by a general denial of any indebtedness to the plaintiff ; and alleged that, as his general agents and factors, they had in all respects faithfully performed their duty, and accounted to plaintiff.

The district judge gave judgment in favor of the plaintiff, and the defendants have appealed.

The following facts are presented by the evidence : The plaintiff was a sugar planter, living upon his estate in the country, and the defendants were his commission merchants at New Orleans. They were at the same time agents of *Goodloe*, an engine builder living at Cincinnati. In November, 1845, the defendants, acting as the agents of *Nolan* and of *Goodloe*, made a contract, which they signed for both principals, for the building and putting up of a sugar mill and engine for *Nolan*. The agreed price was to be paid by *Nolan* to *Goodloe*, in March, 1847. Whatever irregularity there may have been in a contract thus made by the same agent for two principals is immaterial, as both subsequently assented to the contract. *Shaw & Co.* contracted no personal liability, at the time, to *Goodloe*, for the payment. On the 29th December, 1846, *Nolan*, who then had a large amount in the hands of his factors, addressed them a letter,

expressing his dissatisfaction with the machinery furnished by *Goodloe*, and directing them to pay him no money whatever on his account. To this letter *Shaw & Co.* replied on the 2d January, 1847, as follows: "Your favor of the 29th December, is received, and we note contents. We regret very much that you and *Mr. Goodloe* should have any difficulty in settling your business. We will settle nothing without your orders. It has always been our custom to pay out money for no one without orders." The letter then states that a claim for fifty dollars had been presented by a creditor of *Nolan*, and asks whether it shall be paid. At this time, *Shaw & Co.* do not appear to have been under any obligations to *Goodloe*, as guarantors, or otherwise, for the price of the machinery. If such had been the case, they had a fair opportunity of showing it by their clerk, whow as a witness for them in the cause, or in their answers to interrogatories put to them by the plaintiffs. Subsequently, however, as may be fairly inferred, they accepted drafts drawn upon them by *Goodloe*, on account of various contracts, including that with *Nolan;* and on the 18th March, 1847, *Goodloe* was the debtor of *Shaw & Co.* in an amount exceeding that stipulated between *Nolan* and *Goodloe* for the machinery. Thereupon, *Shaw & Co.* paid themselves the debt due by *Goodloe*, by debiting *Nolan* in account current with $7267 43, and crediting *Goodloe* in his account with that sum. In the account with *Nolan*, this item is stated as follows: March 23, 1850. To cost of sugar mill and engine, as per contract with *James Goodloe*, $6250 00; amount of extra work per bill furnished, $1017 43—$7267 43. The relations of factor and principal still continued as usual, between the plaintiff and defendants, after the order not to pay to *Goodloe*, and the promise by *Shaw & Co.* to act accordingly. Further monies were received by them for account of *Nolan*, and disbursements made upon his drafts, or in payment of plantation supplies, &c. On the 21st June, 1847, they rendered their account current, in which he was charged with the amount of $7267 43, in the manner above stated, this being the first advice given of the payment.

It further appears by testimony offered by the defendants, and to the introduction of which the plaintiff excepted, that the machinery was constructed and erected on *Nolan's* plantation by *Goodloe*, in a good and workmanlike manner, and in conformity with the contract, and that it worked well, except some occasional breaking, which the witness, an engineer employed by *Goodloe*, says was not uncommon. Some repairs and changes were made by the witness after the first grinding season was over (1846) without charge by *Goodloe*. These consisted in putting in wheels that had been broken. The witness adds, however, that *Nolan* was always complaining about the machinery.

It is very material to observe, in ascertaining the rights of these parties, that at the time when the order not to pay *Goodloe* was given by *Nolan*, *Shaw & Co.* had not incurred any liablity whatever to *Goodloe*, growing out of the contract for the machinery. They had not guaranteed the payment to be made by *Nolan*, nor entered into any engagement with *Goodloe*, which would have given him a right of action against them. The payment, therefore, must be considered as having been made in violation of the order of their principal and of their promise to obey that order, and in furtherance of their own interests originating after the order was given. We will assume, for the purposes of the present inquiry, that the debt so paid was justly due by *Nolan* to *Goodloe*.

The question thus presented is substantially one of the right of compensation. I owe you, says the defendants, the proceeds of your crops placed in my hands for sale, but you owe me a debt which was justly due by you to *Goodloe*, whose

rights against your orders and in furtherance of my own interest, I have acquired by paying him. Is a factor permitted to make such a defence ?

The relation between factor and principal is not the ordinary relation of debtor and creditor. It is a relation of trust and confidence. It creates a contract in the nature of what is known to the civil law as the irregular deposit. See *Bludworth* v. *Jacobs*, 2d Ann. 28. In the absence of an agreement to the contrary, the factor is to be considered as undertaking to hold the funds confided to him by his principal, subject to his order, and to be ready to pay them over to him upon demand, deducting only his own charges and advances made in the course and within the scope of his employment. In the present case, there was superadded to the implied agreement to hold *Nolan's* funds subject to his order, a positive promise not to use them in paying *Goodloe*.

Now, according to the spirit of our code and the principles of the civil law from which it is derived, compensation does not take place against a party who has confided his funds to another under such circumstances. C. C. 2207 and 2927. Compensation must rest upon the basis of good faith. It is not permitted where its operation would involve a deception and a disappointment of the just expectation and confidence of the party against whom it is set up. Hence, if a creditor should buy goods at the shop of his debtor in such a manner as to hold out the idea that he would pay for them in cash; and after receiving the goods should propose a set off, his conduct would be considered as not in good faith and compensation, would not be allowed. Pardessus, Droit Commercial, vol. 2, No. 325. So it would be with one who, under representation of a pressing exigency, and a promise of an early repayment, should borrow money of another, and refuse afterwards to pay upon the ground that the lender was his debtor. Such artifices, says Mr. Pardessus, are unworthy of the good faith of commerce. Ib. See also Merlin Rep. *verbo* Compensation, ss. 2.

In the examination I have made of the English commentators on commercial law, I have found no case which countenances the pretensions of the defendant.

Mr. Russell, in his Treatise on Factors, states it to be an incontestible principle of mercantile law, that where a party orders his agent to pay money to a third person, but afterwards, before the money is paid or passed into account, countermands such order, the agent, paying after such countermand, must be deemed to have made the payment wrongfully, and will not be entitled to charge the sum in account against his principal. Russell on Factors, 170.

In *Child* v. *Maley*, 8 Tenn. 610, cited by Mr. Paley in his Treatise on Agency, 110, it was held, that if the principal refuse payment upon a contract made by means of the agent, and the agent not being himself liable, but for the sake of his own character, which would be affected by the discredit of the principal, choose to pay the money himself, he cannot recover it; though the principal might himself have been compelled to pay it in the first instance.

It is in vain for the defendants to say, that the debt which he has paid for *Nolan* to *Goodloe* was a just debt; *Nolan* thought, or professed to think, it was not. He could have withdrawn his funds out of his factor's hands, if he had chosen, for aught that appears to the contrary. He left them there and permitted them to accumulate under the express promise that they should not be used to pay *Goodloe*. The payment was a breach of the confidence reposed, and the defendants cannot profit by their own wrong. They must pay over to the plaintiff, upon his demand, the funds entrusted to them, and bring their separate action upon *Goodloe's* claim, as *Goodloe* would have been obliged to do if they had not thought proper, by paying him, to take his place.

We all concur in the opinion of the the district judge as to the other disputed items.

The court being equally divided in opinion, judgment of the district court stands affirmed, with costs.

PRESTON, J. I concur in the foregoing opinion delivered by Judge Slidell.

EUSTIS, C. J. Concurring with Mr. *Justice Shidell* in his statement of the facts of this case and with his view of the law of principal and factor, there are circumstances in it which prevent my assent to his conclusion as to the rights of the respective parties. I consider the law on that subject as correctly expounded by this court in *Bludworth's* case; and if I was conscious that my view in this case conflicted in the slightest degree with what was decided in that case, I should mistrust their soundness and refrain from urging them.

In my inquiry as to the legal rights of these parties I assume, for the sake of argument at the commencement, that at the time of the payment of the debt for the engine by *Shaw & Co.* to *Goodloe*, it was a just and subsisting debt due by *Nolan*, and that, by the payment the debt has been discharged; so that *Nolan* owes *Goodloe* nothing, and *Goodloe* can in no court recover any thing from *Nolan;* and unless he is bound to pay *Shaw & Co.* for the engine he gets it for nothing. A case is thus presented which is so repugnant to the most ordinary sense of justice, that the mere statement of it carries refutation with it. *Shaw & Co.* then can recover back from *Nolan* the amount of the debt which they have thus extinguished, and of which extinguishment he has had and continues to have the benefit, and they can recover on the strictest principles of law. I do not consider that the right of *Shaw & Co.* to recover this money back is at all affected by the mode in which the payment was made by them. They were the general agents of *Goodloe*, and *Goodloe* was their debtor; the payment was made by giving *Goodloe* credit for the amount in account; *Nolan* has nothing to do with this mode of extinguishing the debt; *Goodloe* does not object to it; the debt is paid; and between *Shaw & Co.* and *Goodloe* the affair it must be conceded is strictly mercantile and correct. *Shaw & Co.* at the time were under no engagements towards *Goodloe* on account of the mill &c. The payment was made in direct violation of *Nolan's* orders, but it is not pretended that *Goodloe* at the time was insolvent or in questionable credit. Pothier in commenting on the law *si quis volente*, code lib 2, tit xix *de negotiis gestis*, leg. 24th, in which the opinion of Paulus & Pomponius is confirmed, that a person acquires no right of action for indemnity against one whose business he has interfered with against his prohibition and will, states that the reason of this decision of Justinian is founded on the peculiar nature of the quasi contract, *egotiorum gestorum*, that this contract cannot be pre-supposed where the principal forbids the action of the person, and consequently the action *contraria negotiorum gestorum* will not lie against the person whose business has been done against his directions, and he then adds. He who has transacted the business of another against his formal prohibition, not having, according to the principles we have laid down, the action *contraria negotiorum gestorum* to recover his expenses laid out in the business, ought he to lose them when the person whose business has been transacted has had the benefit of the expenditures? I have, for example, become security for a debt of your's against your orders; I have not the action *contraria negotiorum gestorum* against you for the recovery of what I have been obliged to pay for you, because I acted in violation of your orders; but ought I to lose the sum which I have paid for your benefit, and which has procured to you the release from your debt? Pothier asks if this would not be repugnant to equity, which permits no man to be enriched to the detri-

ment of a third person, and which gives the party his action *in factum*, which action is allowed *quoties alia actio deficit*. The doctors of the Roman law are divided on this subject; but in the jurisprudence of France, in which the names of action are not heeded, and equity itself is sufficient to produce an obligation and ground of action, there is less difficulty. This action, which is given in cases where the business of one is transacted against his orders, does not give to the party the rights of the *negotiorum gesta :* he can only recover of the sums which he has expended those which have inured to the benefit of the principal.

Under the Spanish law the rule appears to be to the same effect. Any one may pay a debt for the debtor, without his authority or mandate, although he be ignorant of it or know it or *forbid it*, and the creditor is bound to receive it and by these means the debtor is discharged according to a text of the Partidas, and he who has made the payment may recover the amount of the debt from the debtor, provided the debt be justly due and that he was necessarily obliged to pay it, according to a text, since the payment was for his benefit, he having been released from the debt according to another text. Curia Phillipica, *verbo* Paga, fol. 383, § 84. The texts referred to are texts of the Roman law, which it is not necessary to examine after having the opinion of Pothier on the subject.

Our code provides that an obligation may be discharged by any person concerned in it, such as a co-obligee or security. The obligation may even be discharged by a third person, provided that person act in the name and for the discharge of the debtor, or that if he act in his own name he be not subrogated to the rights of the creditor. Art. 2130.

This article is the 1256th article of the Napoleon Code. It is curious that the same question which divided the Roman jurisconsults has been renewed with increased vigor and zeal by the commentator on the Napoleon Code. Toullier repudiates the construction which Pothier has given to the decision of Justinian, *si quis volente*. This was one of the fifty decisions given by the Emperor himself on disputed questions of jurisprudence, which refuses an action to a person who has laid out money for another against his orders. This distinguished author considers the decision as conformable to justice and the principles of law, and that it ought to be followed in the jurisprudence of the code.

Troplong has since reviewed the whole controversy and has come to the conclusion that the error on both sides consists in the too great generality of the rule which each party maintains, and that there are certain cases in which this action must be allowed to a party who has laid out money for the benefit of another, even against his positive orders, by which the latter has profited ; but the action is only allowed to the extent of the benefit really accruing to him. 11 Toullier, Droit Civil, § 55. Troplong, Mandat, § 70 to § 86.

I assumed the justness of the debt which *Shaw & Co.* paid for *Nolan*, for the sake of argument. I now state that, in my opinion, the justness of the debt is proved beyond all question, and that *Nolan* had no right whatever to withhold or delay the payment; and that according to the principles of law the claim of *Shaw & Co.* against *Nolan* for reimbursement, is as clear and unquestionable as *Nolan's* right to recover from his factors *Shaw & Co.*, the balance of his account. On looking into such authorities as are at present within my reach, I ought not omit to cite two cases which I consider as justifying the views I have taken of this case : that of *Duncan* v. *Hampton* 6. N. S. 22. and of *Child* v. *Morley*, 4. Durnford & East. 611. In the first case, *Duncan* had paid certain

notes drawn by *Hampton* under a direct and immediate influence, occasioned by his endorsement of the notes which had been executed in virtue of a void transaction. *Hampton* had forbid the payment of the notes; but as the payment had inured to his benefit, he was held to be bound to refund the account to *Duncan's* executors.

I do not understand the case of *Child v. Morley* as deciding the principle stated in the treatise of Mr. Paley. I understand the Court of King's Bench only to have decided that the party, under the circumstances stated, could not recover in the action of assumpsit. Indeed, that case appears to present the same question as that arising under the Roman and French jurisprudence, and to have been determined not on the principle of right but on the form of action in which the party sought his relief.

In *Child v. Morley*, it was determined, that a broker who contracts with others for the sale of stock at a future day by the authority of his principal, who afterwards refuses to make good the bargain, cannot, by paying the difference to such third persons, maintain an action on an implied assumpsit against his principal for the amount. This case had been tried before Lord Kenyon, who permitted a verdict to be taken for the plaintiff, and, on giving his opinion in the Court of King's Bench on a rule taken to set aside the verdict, expressly placed his decision against the validity of the verdict on the form of action, which was that of assumpsit, in which the plaintiff had presented his case. His Lordship observed, "nothing can be more unjust than the defence which has been set up to the whole of this demand ; and that consideration may, at first view of the case, have tended to warp my judgment. But I cannot perceive what benefit the defendant can propose to himself by such conduct; for the court have no doubt but that, at all events, the verdict must stand for the £12 10s., the amount of the plaintiff's commission as broker, under the count for work and labor ; and, I think, that some method or other will be found for making the defendant pay the amount of the difference which the plaintiff has honorably settled on account of his principal's not making good his engagement. But, as to that part of the demand, there is a difficulty in the form of action ; and, perhaps, it would have been better framed *ex delicto* than *ex contractu*. I admit that no man can, by a voluntary payment of the debt of another, make himself that man's creditor, and recover from him the amount of the debt so paid; but what pressed on my mind was, that the plaintiff was under some sort of compulsion to pay the differences." In conclusion, he says, "considering the difficulties of the case in its present shape, as to the sum recovered for the differences, I think it would be better to frame another action for this part of the demand better adapted to the nature of the case."

Chancellor Kent, who appears thoroughly to have examined this subject, states the rule to be this : If there be *any relation* between the parties, a payment without authority may be binding on the person for whose use it was made, if it be under the pressure of a situation in which one party was involved by the other's breach of faith. My opinion is, that the refusal of *Nolan* to pay for this engine was a breach of good faith ; and that the promise of *Shaw &* *Co.* not to pay *Goodloe*, being made on the misrepresentations of *Nolan* to them, was not binding ; and that, under the subsisting relation between all the parties, *Shaw* is entitled to recover the debt which he has paid, it having inured exclusively to the benefit of *Nolan*.

If we could determine on these cross claims, my impression is, that we would not allow *Nolan* to receive from *Shaw & Co.* the whole of his debt. *Frustra*

*petis quod nux restiturus erit.* We would, in determining *Nolan's* debt to *Shaw & Co.* for the engine to be justly due, allow *Shaw & Co.* to retain the amount in compensation or extinguishment of their debt; that is, would set off one judgment against the other. I say, we would, I think, be bound thus to adjust the differences between these parties, had *Shaw & Co.* presented their claims in a proper reconventional demand. Under the rules of the Code of Practice, art. 329, 374, *et seq.*, I think the connection of *Shaw & Co.'s* claim with the principal demand of *Nolan* is sufficiently evident to authorize the recovery of their debt by way of reconvention. If such would be the result under proper pleadings, what is the proper course to be pursued as the case is now before us.

My brethren, who have come to the conclusion that *Shaw & Co.* are without remedy in the present suit, consider that the payment made by them cannot be set up as a defence or in compensation to the plaintiff's action according to the principles of law. Even conceding, for argument sake, that opinion to be correct, I cannot concur in the conclusion that *Shaw & Co.* are not entitled to relief from our hands. Under this view of the subject, I assume that *Shaw & Co.* were bound to set up their claim against *Nolan* for the amount paid *Goodloe* in a reconventional demand. They have not done so, but alleged it as a matter of defence to the plaintiff's action; and under this allegation, evidence, establishing the justness of the debt due by *Nolan,* was received by the court. To the admission of the evidence a bill of exceptions was taken, but I do not think it is properly taken according to the rules of practice, by reason of its vagueness. Here we have both parties at fault, and as, from the evidence before me, I come to the conclusion in favor of the equity of *Shaw & Co.'s* claim, I think the case ought to be remanded for further proceedings, with the privilege of the defendants to file their claim in reconvention; and that the amount thereof stand for so much in satisfaction of the plaintiff's judgment, the execution of which ought to be suspended until the said reconventional demand be adjudicated upon.

The difference between us resolves itself into a mere question of practice, apparently of little moment, but probably the cause of all this difficulty between these parties. *Nolan* seeks one of the courts of *Shaw & Co.'s* domicil to exact the amount due by them as his factors ; but to their demand against him offers to them, as he did to *Goodloe,* the recourse against him at his domicil in the parish of West Baton Rouge. As I think the demands are connected with each other, and dependant on the relations of *Shaw & Co.,* not only as *Nolan's* factor, but as agents of both *Nolan* and *Goodloe;* and as the factors of the latter, I think *Nolan,* under our system of laws, is bound to litigate the whole matter before the tribunal which he has selected.

ROST, J. The claim set up by the defendants against the plaintiff being due, it appears to me that the case presents a mere question of practice.

The plaintiff resides in the parish of West Baton Rouge, and defendants in the Parish of Orleans. An act of the Legislature, amendatory of art. 375 of the Code of Practice, provides that when the parties to a suit reside in different parishes the defendant may reconvene for any cause whatever. Session Acts, 1839, p. 164.

Had this plea been made below, it is clear that the district judge would have been bound to entertain it. The defendants pleaded compensation; and the only question which divides the court is, whether the case shall be remanded to enable the defendants to amend. I think this a proper case for the exercise of the power vested in us, to remand cases when justice requires it.