Statement of the Case.
MONROE, C. J.
The administratrix of this succession prosecutes the appeal herein *239 from a judgment in favor of the Segura Sugar Company, Limited (hereafter to be called the “Company”), upon a series of rent notes which had been executed by her decedent in conformity to a certain contract of lease, containing also stipulations in regard to the sale and purchase of sugar cane to be grown on the leased premises; and the Company answers the appeal, praying that the judgment be amended. By the same judgment Lassalle & Eves are recognized as creditors of the succession, with vendors’ privilege on the proceeds of five mules; but their claim appears to have been established to the satisfaction of all parties, and the judgment, in that respect, is not here contested. The facts involved in the controversy between the Company and the succession may be stated as follows:
The administratrix obtained an order for the sale of the movables, to pay debts, and the Company and Lassalle & Eves intervened, setting up their respective claims, as lessor and vendors, and praying that the property upon which they claimed privileges be appraised and sold separately, which was accordingly done. Upon the trial of the Company’s intervention, it was shown that it owned and operated a sugar factory, and that, upon the opposite side of the road therefrom P. H. Segura and his wife resided and owned several tracts of land, and that the decedent, M. C. Romero, also owned a small tract, upon which he resided; and (to adopt the narrative form), further, as follows, to wit: On July 29, 1911, Mrs. Segura leased a tract, or lot, owned by her, to Romero for five years, at $25 a year; but thereafter the Company, desiring to lease from Segura the tracts owned by him, and insisting that there should be included the tract, or lot, owned by Mrs. Segura, the lease from Mrs. Segura to Romero was canceled by consent, and on September 27, 1911, the entire property (being not less than 300 arpents) was leased by Mr. and Mrs. Segura to the Company for 10 years, from January 1, 1912, at an annual rental of $1,800, and on March 6, 1912, the Company subleased the same property, for the term ending December 30, 1921, at the same annual rental (represented by 10 notes, for $1,800 each, maturing on December 30, 1912, and annually thereafter, to 1921, inclusive), with certain other stipulations, however, to the decedent, M. C. Romero. Among the other stipulations of the contract were the following, to wit:
“A further consideration of the lease contract herein entered into is that the property leased for 10 years shall be annually planted in sugar cane, and that all cane raised on any of the property herein shall be sold and delivered to the Segura Sugar Co., Ltd., at its cane shed, and the price to be paid shall be the average price for cane delivered at the cane shed in carts or wagons. It is further agreed and understood that, not later than February 1st of each year, there shall be executed between the parties hereto a formal contract, upon the standard form of contract of the Segura Sugar Co., Ltd., to cover the question of the sale of cane herein raised * * * to the Segura Sugar Co., Ltd., the price to be stipulated in said contract to be the average price paid for cane delivered at the cane sheds, in carts or wagons. And the lessor further agrees not to impede or delay the lessee in delivering his pro rata share of cane-to the cane shed, each day, as embodied in standard form of contract.”
“The lessor further agrees with the lessee that, in the event it should decide to give away, locally, any of the filter press mud, coming from its filter presses, then, it will give the same to the lessee for his own exclusive use, to be distributed as fertilizer upon the property herein leased.”
The note which fell due December 30,1912, was paid at maturity, and the lessee occupied and cultivated the leased land during the year 1913, up to the date of his death. The Segura Factory was burned in August, 1913, but the lessor made arrangements for the grinding, at another factory, of the cane for which it had contracted, though with no change as to the place of delivery, and the crop of 1913 was delivered at its “sheds,” as per contract.
On November 4, 1913, the Company wrote *241 to Romero, inquiring whether he wished it to hold back, from the proceeds of his cane, the amount required to pay the note falling due 'December 30th, or would prefer to be settled with in full, and take care of the note when due, but Romero was mortally ill at that time, and died on November 26th, and no reply was made to the letter. The cane was subsequently delivered, between November 10th and December 12th, and the proceeds, amounting to $1,578.61, together with so much as was required from a sum of $527.45 which had been collected by the Company from “store accounts” due to Romero, were applied, after the death of the latter, to the payment of the note.
Ulysse and Leon Landry are the brothers of Mrs. Romero, P. H. Segura, is her uncle, and Octave Romero is a surviving brother of M. C. Romero, deceased. Ulysse Landry owns land, not far distant, but separated by the land of another, from that which is the subject of the lease here in controversy, and the decedent was planting Landry’s land (on shares) as well as the leased land. They, therefore, saw a good deal of each other, and Landry appears to have attended, at times, to some business matters for Romero, and, after his death, for the widow and administratrix, as did also Leon Landry and Octave Romero. Ulysse Landry testifies that, at some time during the year 1913, at the request of the decedent, he spoke to the Company’s manager about the special cane contract (referred to in the excerpt, heretofore given, from the lease), and there seems to have been some rather indefinite conversation on that subject.
He further testifies, and there is some corroboration from the others, that, because the company had failed, upon February 1st, to tender the decedent such special contract, he (the decedent) considered, and so stated, that the entire contract was abrogated, and that he was at liberty to’ surrender the property and sell his cane to whom he pleased, and that he, in fact, entered into some negotiations with another party for the sale of his cane. There is no intimation in the testimony, however, that the conversation between the witness and the manager of the Company took the form of a putting in default, or was so intended, or, that the Company was ever informed that the decedent regarded himself as absolved from the contract, and, as the contract was carried out so long as Romero lived, and afterwards, until the crop of 1913 had been delivered, according to its terms, a different impression in regard to his mental attitude was naturally created.
Mr. Landry also testifies that, after the death of Romero, he called on the manager of the Company and had another conversation, in which the manager said, in effect, that the company was willing that the lease should be considered at an end, and that the administratrix was at liberty to dispose of the movables belonging to the succession and then on the leased premises. The manager gives a different version of the conversation, and of the situation generally. He says that Romero called at his office about November 1st — being then a very sick man and on his way from Covington (where he had gone for relief) back to his home (where he died on November 26th); that they conversed for half or three-quarters of an hour upon general topics, the condition of Romero’s health, etc.; that the lease was not mentioned; and that until after Romero’s death he had had no intimation of any attempt to rescind it; that he said nothing to Landry, upon the occasion of that gentleman’s visit (which was on December 17, 1913), to lead him to believe that the Company considered the lease at an end ; that what he did say was, in substance, that he could not speak for the Company, but that he felt that, if P. H. Segura (Mrs. Romero’s uncle and the Company’s lessor) would be willing to cancel his lease to the Company, the Company would be willing to cancel its sublease to Romero. In the meanwhile, as *243 the representative of the Company, he considered it his duty to protect its interests, and, upon the day that the conversation took place, he wrote letters to Mrs. Romero, administratrix, and to her attorneys, respectively, calling her, and their, attention to the existence of the sublease and to the rights of the Company thereunder, notifying both of the lessor’s privilege, and warning them not to remove any of the property which was subject thereto;
Included in the property upon which the Company asserted the privilege in question were certain mules, horses, harness, and farming implements, which were shown not to have been on the leased premises at all after December 3, 1913, and never to have been there, save during the days when they were in actual use, the animals having always been stabled, fed, and watered, and the implements and harness, kept (when not in actual use on the leased premises), upon the Landry tract, which, as we have stated, was also cultivated by Romero, and is separated from the leased property by the land of a third person.
It was shown that the decedent expended $29.92 for lumber required for the building of necessary bridges on the leased premises, which had been removed by P. H. Segura; and, according to the testimony of Mr. Landry, the manager of the Company promised to make good that amount.
There was judgment in the district court in favor of the Company, and against the succession, for $14,621.39 (being the balance of rent called ior by the lease, after deducting the note for $1,800, due and paid, December 30, 1912, and after crediting on the note due December 30, 1913, the $1,578.61 due by the Company, as the price of the cane delivered in 1913), with interest, attorney’s fees, and costs, and with recognition of the lessors’ privilege on the proceeds of certain seed cane, corn, and hay, and upon an automobile, found on the leased premises; the claim for recognition of privilege, claimed on 14 mules, 2 horses, 14 sets of harness, plows, and farming utensils, shown to have been kept on the Landry tract, was rejected; the claims of the succession for $527.45, shown to have been collected by the Company from store accounts due to the decedent, and for $29.92, expended for bridges, were sustained'; and there was judgment in favor of Lassalle & Eves (not here disputed), awarding them the proceeds of five mules, which they had sold to the decedent and for which they had not been paid.
Opinion.
[1-5] The contention that the lease sued on had been dissolved, prior to the death of the lessee is not sustained by the evidence, since the stipulation concerning the cane contract did not require the lessor to seek out the lessee and tender him such a contract, and the indefinite conversation to which Landry testifies did not take the form of a putting in default, was not so intended, and was followed by the execution of the contract, by both parties, up to the death of the lessee, and thereafter, on his behalf, by his administratrix, until the crop of 1913 had been disposed of, from which, and from the fact that the cane was delivered and received at the place originally agreed on, it follows that neither the failure of the parties to enter into the cane contract nor the destruction of the Company’s factory operated to prevent the continued execution of the main contract, and those matters cannot now be set up as reasons for holding that it was thereby ipso facto annulled.
The first intimation that the lessor received of the desire of the administratrix to be relieved of the lease was from the conversation between its manager and Ulysse Landry, on December 17, 1913, by reason of which the manager on the same day wrote the two letters which are mentioned in the statement of the case, advising and warning, the adminis *245 tratrix and her counsel that the Company, as lessor, would insist upon its rights. Thereafter the administratrix, by obtaining an order for the sale of all the movable property of the succession, including seed cane, working animals, farming implements, etc., indicated her purpose to abandon the property; and in her answer, herein filed on February 7, 1914, she says, among other things:
“Defendant also denies that the contract sued on is any longer enforceable, but defendant admits that she had refused to work the Segura place or to regard the lease as binding.”
We think, therefore, that the lessee must be considered to have abandoned the leased premises without legal cause ; and the first question which presents itself is whether the remedy sought by the lessor is authorized by law. The prayer of the opposition is for judgment for $14,400, with recognition of privilege, etc. (being the aggregate amount of the rent called for by the lease, less the $1,800 paid for the year 1912, and a like amount, in the hands of the lessor, and which it has assumed to attribute to the payment of the rent for 1913) or, in the alternative, for judgment for the amount stated, with the qualification that it be paid in annual installments of $1,800 each, as called for by the contract.
The question at issue was first considered by this court in the- case of Christy v. Casanave, 2 Mart. (N. S.) 451 (1824), where it appeared that plaintiff had leased to defendant a house for three years, from May 1, 1822, that defendant had paid the rent to Ajigust 30, 1823, when he abandoned the premises, after notifying the lessor of his intention, and that plaintiff sued for the balance of $702, which, according to the lease, was thereafter to become due. In the opinion of the court, by Mr. Justice Porter, it is said:
“We were of opinion, when the argument closed in this case, that the plaintiff could not support his action; that if he wished to enforce his contract, notwithstanding the tenant’s declaration, he could only do so according to the contract; that is, at the end of each month. But an examination of the authorities has satisfied us that landlords, who in all countries have had a great share in making laws, have secured to themselves the extraordinary privilege of enforcing the contract for the whole term if the tenant leave the premises before the expiration of the lease. The following example is given in the Roman law: * * * Tf a house or a plantation has been rented for five years, the owner may bring an action, at once, against the tenant or farmer, if he abandons the land, or leaves the house.’ Dig. Liv. 19, tit. 2, law 24, No. 2; Id. 65, No. 2; Febrero, p. 1, cap. 6, § 1, No. 11; Ferraris Bib. verbo, ‘Locatio,’ No. 62. Whether the defendant was authorized to abandon the house or not, in consequence of its wanting repairs, was a question of fact, properly submitted to the jury. * * * The finding of the jury that the defendant should pay the sum between what the plaintiff had been able to rent the premises for since they were abandoned, and that which was stipulated between the parties to the original contract, was just and equitable, and strictly conformable to law.” .
In Reynolds v. Swain, 13 La. 193 (1839), it appeared that plaintiff had leased a brick tenement to defendants for one year, from November 1, 1836, at an annual rental of $1,500, payable in monthly installments of $125; that defendants abandoned the premises, after occupying them for two months, without paying anything, and that plaintiff sued for the entire amount called for by the lease. It was objected that the suit was premature, as to the installments which had not matured. Martin, J., delivering the opinion, said:
“In the case of Christy v. Casanave, * * * this court held that if the tenant abandon the premises during the lease, he is bound for ren-t for the whole term at once. It has been contended that this decision took place under the civil laws of this state, which were repealed in 1828, and before the promulgation of the Louisiana Code, and which provides that the Spanish, Roman, and French laws which were in force in this state when Louisiana was ceded to the United States, and the acts of the legislative council, of the Legislature of the territory of Orleans, and of the Legislature of the state of Louisiana are repealed in every case, which is specially provided for by that Code, and that they shall not be invoked as laws even under the pretense that their provisions are no* contrary or repugnant to those of the Code. See Louisiana Code, art. 3521.”
*247 The court, however, concluded that the Spanish, Roman, and French civil laws which were repealed by the Louisiana Code were the “positive, written, or statute laws of those nations and of this state,” that “it was not the intention of the Legislature to abrogate those principles of law which had been established or settled by the decisions of courts of justice,” and that the decision in the case of Christy v. Casanave had not been grounded on any such statute law, in force in Louisiana at the time of the alleged repeal.
“Nevertheless [the opinion proceeds] it is the daily practice in our courts to resort to the laws of Rome and France, and the commentaries on those laws, for the elucidation of principles applicable to analogous cases. Although the Roman law, on which the case of Christy v. Casanave was determined, had no intrinsic authority here, the reason that dictated that law has great cogency. When a tenant removes his goods from the premises and abandons them, he withholds from the landlord the pledge he had given for the payment of the rent. It is therefore just that the latter should be permitted immediately to secure himself, if he can, by the seizure of the property * * * or by a personal action against the tenant.
“The district judge has provided for the security of the latter, by directing that the execution should not immediately issue for more than the amount of the debt actually payable, and afterwards, at the end of every month, for the monthly rent,, affording him the opportunity of seeking relief, if he has any right thereto, on account of any rent received by the plaintiff from other tenants.”
In Deslix v. Jonc, 6 Rob. 295, the case of Christy v. Casanave is cited as supporting the proposition that the lessor would have the right to seize the property found upon the leased premises for rent, to become due “up to the end of the lease,” though that precise question does not appear to have been an issue in the case then before the court.
In Roumage v. Blatrier, 11 Rob. 107, it appeared that defendant (through an agent) had leased certain property to one Fessard (with whom the plaintiff, Roumage, had bound himself, in solido), for five years, at an annual rental of $3,000, payable in monthly installments of $250; that the lessee paid the rent for two months, and having ceased to pay, that judgment was rendered against him for-$14,000, with recognition of privilege and right of pledge upon goods seized, of which amount $1,000 was past due, and the balance was to be collected on executions, to be issued monthly, according to the lease; that the rent was then paid for about 18 months, when there was again a failure to pay, and that suit was then instituted and judgment obtained against Roumage, for one month’s rent, which was followed, a month or so later, by another suit, in which Roumage was condemned to pay another month’s rent and the further sum of $10,250, to be paid, $1,-750 within 10 days and the balance in monthly installments of $250, to the expiration of the lease. Thereafter Roumage sued for the dissolution of the lease, and enjoined an execution which had been issued; the ground relied on by him being that, after obtaining his judgment, the lessor had leased the premises to a third person, which view was sustained by the district court. This-court held, however, that, according to the evidence, the lessor had only taken temporary possession, and had collected rents, from subtenants, for the benefit of the lessee, who had refused to collect them, and the opinion continues as follows:
“In the case of Christy v. Casanave * * * this court recognized the principles that if, on a lease for years, the lessee abandon the promises, the. landlord may demand the rent for the whole term, and that sueh lessee is bound to pay the sum between what the lessor has been able to rent the premises for since they were abandoned and that which was stipulated between the parties to the original contract. This doctrine was again adopted in the case of Reynolds v. Swain, 13 La. 198. It is just and equitable, and should govern the present case.”
It was therefore held that the lease had not been dissolved, and that the judgment obtained by the lessor was still effective, but that plaintiff should be afforded an opportunity to show the credits to which he was en *249 titled (by reason of collections made by tbe lessor from other tenants) and also that the leased property had been sold by the lessor, without reservation as to the lease, •and, that the lease had been dissolved on that account; and the case was remanded.
In Sigur v. Lloyd, 1 La. Ann. 421, the lessor sued to annul a lease for nonpayment of rent, and to recover rent past due and to become due, but it was held by this court that, the lease being annulled, the obligation to pay rent ceased, and that, under our law (differing, in that respect, from the French law), the only case in which rent can be recovered, after a lease has been dissolved, by reason of the fault of the lessee, is when the latter has made “another use of the thing than that for which it was intended.”
“Our Legislature [reads the opinion] has thought proper to place the contract of lease, so far as concerns the general subject of dissolution, on the same footing as contracts generally. It is to be remarked that, whatever apparent equity there may be in the view presented by the plaintiff’s counsel, the omission to provide such relief as he asks cannot be considered as accidental. Our Code, in the great mass of its provisions, follows the Code Napoleon. That Code contains an express provision on the subject, which the compilers of our Code have thought proper to omit, except in a special case. But even under the French law, relief is not given to the extent that the decree of the court below has given on this occasion. ‘En cas de résiliation par la faute du locataire, celui-ci est tenu de payer le prix du bail pendant Ie temps nécessaire a. la relocation, sans prejudice des dommages et intérSts qui ont pU résulter de I’abus.’ Code Nap. art. 1760. Now a part of this rule is adopted in our Code, but with this change: In the Code Napoleon the expression is general, ‘résiliation par la faute du locataire.’ In our Code the relief is given in a single case: ‘If the lessee makes another use of the thing than that for which it was intended, and if any loss is thereby sustained by the lessor, the latter may obtain the dissolution of the lease. The lessee, in that case, shall be bound to pay the rent until the thing is again leased out, and the lessee is also liable for all the losses which the proprietor may have sustained through his misconduct.’ ” See C. C. art. 2711.
Referring to tbe decisions in Christy v. Casanave and Reynolds v. Swain, tbe court said:
“It is unnecessary, upon the present occasion, to enter into a'discussion of the principles upon which those decisions were based. * * * In both those cases the decision was based upon the abandonment of the premises, and the abstraction of the furniture and goods, which are the landlord’s pledge. I-Iere the tenant did not abandon the premises, nor abstract the goods. He simply failed to pay the rent, and for this breach of his contract the landlord asked that the lease should be dissolved and the tenant expelled.”
And tbe judgment of tbe district court was reversed, in so far as it condemned tbe defendant for rents wbicb bad not actually fallen due. Tbe cases of Reynolds v. Swain and Sigur v. Lloyd differed essentially, in tbis: That in tbe one tbe lessee could not, and did not, by abandoning tbe premises, dissolve tbe lease, and tbe lessee sued upon it as an existing contract; whereas in tbe other, though the lessee could not, and did not, dissolve the lease by failing to pay his rent, tbe lessor chose to sue for, and tbe lessee acquiesced in, tbe dissolution.
There is, however, no express provision in our law under wbicb a lessor suing a lessee upon his contract, whether for cause of mere failure to pay rent or for that cause coupled with abandonment of tbe leased premises, can do more than enforce the contract according to its terms; and tbe opinion in Reynolds v. Swain, to tbe effect that, in ease of abandonment, .judgment may be rendered, not only for the rent wbicb is actually due; but for that wbicb, under tbe contract, is not due and is only to become due in tbe future, concedes that to be true, for it is based upon tbe ruling in Christy v. Casanave wbicb it comments upon and interprets as follows, to wit:
“Although the Roman law, on which the ease of Christy v. Casanave was determined, had no intrinsic authority here, the reason that dictated that law has great cogency. When a tenant removes his goods from the premises and abandons them, he withholds from the landlord the pledge he had given for the payment of the rent. It is therefore just that the latter should be permitted immediately to secure himself, if he can, by the seizure of the property, or by a personal action aigainst the tenant.”
*251 The reason why a pledgee should be permitted to retain the pledge until his debt is paid is obvious enough; his contract gives him that right, and the law, having authorized the contract, may be invoked for its enforcement. It will be observed, however, that from the beginning, while the right of the lessor to obtain judgment against the lessee who abandons the leased premises for the full amount called for by the lease, and at once to execute the judgment as against, and to the extent of, the property found subject to his privilege and right of pledge, has been recognized, the rights of the lessee have also been recognized to the extent that, save as to such property, the lessor has been permitted to execute his judgment only in accordance with the terms of the contract; that is to say, to enforce payment of the respective installments of rent as they fall due, and that in the meanwhile the lessee has been afforded an opportunity to require that he be credited with the revenues of the property that the lessor may collect. Thus, in Holden v. Tanner, 6 La. Ann. 75, it was said:
“It is well settled, as part of the law of landlord and tenant, under our jurisprudence, that the lessee who without lawful cause abandons the premises before the expiration of the lease is at once bound for the rent for the whole term, and that the lessor does not destroy his recourse * * * by letting them to new tenants, being, however, equitably bound to make an allowance to the original lessee for what he may * * * collect. See Christy v. Casanave, 2 Mart. (N. S.) 451, and Reynolds v. Swain, 13 La. 194.”
And the jurisprudence, thus referred to, has been affirmed in the later cases of Ledoux v. Jones, 20 La. Ann. 539, Henderson v. Meyers, 45 La. Ann. 798, 13 South. 191, and O’Kelly v. Ferguson, 49 La. Ann. 1230, 22 South. 783, being predicated upon the principle that, so long as the contract exists, the lessor is entitled to recover his rent according to its terms, if he can, or, where the lessee abandons the premises, by at once enforcing his claim as against the property subject to his privilege and pledge, in order to do which he may obtain a judgment, and otherwise execute it in accordance with the terms of the contract, and that the lessee is entitled to the possession, fruits, and revenues of the property whether he occupies or abandons it, pays the rent or leaves-it unpaid, since he cannot terminate the lease by violating its provisions, and though the lessor may terminate it, for violations by the lessee, he is not obliged to do so, and if he prefers to seek its continued enforcement, he thereby concedes to the lessee the-rights which it confers upon him. On the other hand, when the lease ends — whether at the instance of the lessor or of the lessee, or by expiration of its term — the rights derived from it end. In Segur v. Lloyd, supra, the court said:
“The lease being * * * dissolved, the covenant of the lessee for future rent has also ceased to exist. The rent was to be the compensation for the occupation of the property under-the contract. That contract has been annulled, and the possession taken from the tenant by the-decree. The defendant could not have taken advantage of his own default to annul the lease; but the injured party could, and he has availed himself of it. The dissolution is the result of his own voluntary option; the law entitled him to obtain judgment and execution from time-‘to time’ down to the end of the term, had he-chosen to leave the tenant in possession.”
In the case cited, the lessor caused the lease to be annulled because the lessee failed to pay the rent. The situation would have been the same if he had caused it to-be annulled because the lessee had abandoned the property, or for any other breach of the-contract.
In this case, though the lessee abandons the leased premises, the' lessor does not seek to annul the lease, but to enforce it, by obtaining judgment for the rent to the end of the term, and it is entitled to execute that judgment at once, as against the proceeds of the property which was subject to its privilege and right of pledge, and for the balance-in accordance with the provisions of the- *253 lease; and the succession is entitled to protection with respect to its right to the possession and the fruits and revenues of the property, for the rent of which, it is thus held liable. The judgment appealed from must therefore be amended in those respects. It must also be amended with regard to the disposition made by it of the proceeds of the cane crop of 1913, which opponent attributed to the payment of the rent for that year. It is true that opponent was entitled to a privilege on the crop; but it is also true that it was at liberty to buy the crop as for cash, which it did, and, the cane having been sold and delivered to it on that basis, its privilege was lost in its title as owner. It then became the debtor of the vendor for the price; and, the vendor being an insolvent succession, its unmatured obligation for rent cannot be pleaded in compensation of that debt. The same principle governs the question of opponent’s right to apply to the payment of the rent the amount collected by it from the “store accounts” due to the decedent. Nolan v. Shaw, 6 La. Ann. 40; Guilbeau Bros. v. Melancon, 28 La. Ann. 627; Bank v. Keenan & Slawson, 35 La. Ann. 1129; Seixas v. Bank, 38 La. Ann. 432; Succession of Gragard, 110 La. 702, 34 South. 742. The animals and implements that were not kept or found on the leased premises, and were not there at all within a month preceding the assertion of the lessor’s privilege, were not subject to that privilege. With the amendments noted, the judgment appealed from will be affirmed.
It is therefore ordered, adjudged, and decreed that the judgment appealed from be amended; by increasing the amount of the award in favor of the Segura Sugar Company, Limited, from $14,000 to $16,200; by reserving to the succession of M. C. Romero, and its legal representatives, the right during the continued enforcement of the lease sued on, to require that company to credit its judgment with such fruits and revenues as may have, or may hereafter, come into its hands from the leased property, and through its said representatives to take such steps as may be deemed advisable to make said property productive; by increasing the amount of the award in favor of the succession and against said company from $521.45, to $2,100.06; by directing that the amount thus due to the succession and that which the succession is adjudged to pay, by preference, to the company be held, the one to compensate the other, pro tanto, the balance, if any, to be paid by the party who may owe it; by limiting the right of the company, otherwise than as thus decreed, to enforce payment of its judgment, save in accordance With the provisions of the lease sued on, to wit,.for the amounts and at the maturity of the rent notes ’sued on, respectively, with interest at the rate of 8 per cent, per annum from the respective maturities of said notes.
It is further decreed that, as thus amended, said judgment be affirmed, the Segura Sugar Company, Limited, to pay the costs of the appeal.